IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2019

### ANTONIO M. CROCKETT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2013-D-2862     Cheryl A. Blackburn, Judge**

_____

### No. M2018-01416-CCA-R3-PC

_____

The Petitioner, Antonio M. Crockett, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury conviction for first-degree felony murder. On appeal, the Petitioner alleges the following grounds of ineffective assistance of trial counsel: (1) failure to impeach a witness; (2) failure to assert a proper basis for severance pretrial or renew the motion to sever at trial; (3) failure to request a jury instruction; (4) failure to object to the State's articulating multiple theories during its closing argument; (5) failure to object to the prosecutor's inflammatory comments during the State's rebuttal argument; (6) failure to develop and present evidence of the disproportionality of a mandatory life sentence. The Petitioner also argues that his mandatory life sentence is unconstitutional and that he was deprived of a fair trial on the basis of cumulative error. After a thorough review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., AND ROBERT L. HOLLOWAY, JR., J., joined.

Lesli Oliver Wright, Nashville, Tennessee, for the appellant, Antonio M. Crockett.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

FACTUAL BACKGROUND[1]

_____

[1] Our review of the facts will be limited to those relevant to the issues on appeal.

The October 2013 term of the Davidson County Grand Jury charged the Petitioner and his co-defendant, Raymond Douglas Wilson III, with the first-degree felony murder and first-degree premeditated murder of Derrick Lyons. See Tenn. Code Ann. § 39-13-202. Following a joint jury trial, the Petitioner was convicted of felony murder and acquitted of first-degree premeditated murder; co-defendant Wilson was acquitted of both charges. See State v. Antonio M. Crockett, No. M2015-00566-CCA-R3-CD, 2016 WL 769890, at *6 (Tenn. Crim. App. Feb. 29, 2016), perm. app. denied (Tenn. Jun. 23, 2016). The Petitioner received a mandatory life sentence, which was to be served consecutively to a sentence for a previous conviction. Id.

### A. Pretrial Motions

Prior to trial, the Petitioner filed two motions to sever his trial from that of co-defendant Wilson. After the first motion, which was based upon a potential confrontation issue if the defendants' statements to law enforcement were introduced, the State "announced that it did not intend to admit any statement from co-defendant Wilson that would incriminate the [Petitioner] at trial." Crockett, 2016 WL 769890, at *1. The State also redacted the Petitioner's police statement to remove references to co-defendant Wilson. Id.

The second motion was based upon the Petitioner's right to a speedy trial. Crockett, 2016 WL 769890, at *1. The Petitioner argued that he had been in custody since 2012 and that two indictments had "been nolled since that time."[2] Id. This court summarized the remainder of the second pretrial severance motion as follows:

> [The Petitioner] argued that he had not waived his right to a speedy trial and that the State's recent request for fingerprints and testing of DNA evidence created "the obvious prospect of new last-minute evidence and expert testimony" and a need to continue the [Petitioner]'s trial, which was scheduled to begin July 28, 2014. The [Petitioner] additionally argued that a severance was necessary because there was a disparity in the proof against the defendants; the defendants' knowledge of each other's statements caused "mutual animosity and resentment," necessitating extra courtroom security; and it was possible that one of the defendants' out-of-court statements led to the discovery of incriminating evidence against the other.

---

[2] The record reflects that two superseding indictments were filed in this case. In the first two indictments, the Petitioner and a Timothy Wilson were charged. In the second superseding indictment, co-defendant Raymond Wilson was charged for the first time.

The State responded that the [Petitioner]'s motion should be denied because there was no legal basis for a severance and argued that the defendants be tried together for the sake of judicial economy. Additionally, the State noted that the [Petitioner] was in jail serving a sentence until 2017 and that the [Petitioner] had several other pending cases. The State further contended that the DNA evidence could implicate the [Petitioner] because the victim's car was driven away from the scene by co-defendant Wilson but found near the [Petitioner]'s mother's house. The victim's car had been "gone through," and the State's theory was that the [Petitioner] was "one of the ones who went through that car." The State conceded that its failure to have the DNA evidence tested sooner was "an oversight" and that "[i]t should have been done earlier."

The trial court noted that it had been made aware, at a hearing on June 27, 2014, of the existence of possible trace evidence which might contain identifiable DNA. The court explained that, although co-defendant Wilson had not opposed a continuance in order for the State to conduct DNA testing, the [Petitioner] had objected to the continuance, asserting that the testing would take months to complete. When the trial court asked whether the redacting of the [Petitioner]'s statement would prevent the [Petitioner] from introducing proof necessary for a fair trial, defense counsel responded, "I don't foresee that at the moment." As to the speedy trial issue, defense counsel stated that the [Petitioner] would have no problem with securing witnesses or presenting defense proof because of the delay of the start of trial. Defense counsel agreed that the basis of his allegation of prejudice was the additional time the [Petitioner] could spend in confinement given the time he had already spent in custody. The trial court also asked the [Petitioner] about the potential for ordering a severance during trial based upon proof arising that necessitated it. The [Petitioner] stated that the trial court could do so if needed but indicated that he "would sort of like to not be at that point."

Following the hearing, the trial court filed a written order denying the motion to sever and granting the State's request for a continuance of the [Petitioner]'s trial. The trial court determined that there was no Bruton [v. United States, 391 U.S. 123 (1968),] issue because the State agreed not to use either co-defendants' statements at trial. The trial court found that the animosity between the two defendants was an insufficient reason to grant a severance. Additionally, the trial court determined that the pending DNA testing was a proper basis for a continuance and that considerations of judicial economy weighed in favor of a joint trial. Finally, the trial court

found that the [Petitioner] was not prejudiced by the delay and noted that the reason for the [Petitioner]'s incarceration was that the [Petitioner] was serving another sentence and had multiple cases pending before the court.

Id., at *1-2 (footnotes omitted).

*B. Trial*

At the January 2015 trial, Jenenia Keeler, the victim's fiancée ("Ms. Keeler"), testified that on June 30, 2012, she was at her mother's house prior to a planned swimming trip when the victim called her and said that he was ready to go. Crockett, 2016 WL 769890, at *2. As Ms. Keeler walked to the front door, her sister, Kathy Patterson, came in from outside and told her that the victim had been shot. Id. Ms. Keeler ran outside and saw the victim "squeezing out" of the driver's side door of his SUV. Id. Another car was parked "[r]ight beside" the victim's driver's side door such that the victim could not drive away. Id. The victim ran across the street toward Ms. Keeler, and she saw that he had a "red spot" on the right side of his shirt. Id. Ms. Keeler made the victim lie down, and eventually an ambulance arrived. Id. at *2-3. Ms. Keeler noted that the victim "had been known to carry cash." Id.

Ms. Patterson testified that she was on her mother's front porch when she heard a gunshot and saw the victim getting out of his car. Crockett, 2016 WL 769890, at *3. The car was "hemmed in" by a black car facing the same direction. Id. The victim had to struggle to exit his car because he was "pinned in." Id. Although Ms. Patterson did not see anyone inside the black car, she had seen the Petitioner, whom she knew as "Bull," driving the same car three or four times in the month preceding the shooting. Id.

Robert Rooks, the victim's cousin, testified that on the day of the shooting, he was walking through an alley when he heard a gunshot. Crockett, 2016 WL 769890, at *3. A man ran into the alley and told Mr. Rooks that the victim had just been "shot and robbed." Id. As Mr. Rooks ran toward the victim, he saw the victim's SUV turn right onto another road. Id. Mr. Rooks was the first person to reach the victim, and the victim told Mr. Rooks several times, "Bull blocked me in." Id. Mr. Rooks had known the Petitioner for ten years and stated that the Petitioner's nickname was Bull. Id.

Cleo Keeler, Ms. Keeler's mother ("Mrs. Keeler"), testified that she called 9-1-1 after the victim had been shot, that she saw a black car "sitting alongside" the victim's SUV, and that although she did not see who was inside the black car, she knew it to be the car the Petitioner drove. Crockett, 2016 WL 769890, at *4. While Mrs. Keeler was on the phone, she saw an unknown man get into the driver's seat of the victim's SUV; both the black car and the SUV drove away. Id.

-4-

Laquitta Waters testified that she was driving in the area of the shooting and that while she was stopped at a stop sign, she heard a "big boom" and saw co-defendant Wilson standing by the front passenger's side door of the victim's SUV with a gun in his hand. Crockett, 2016 WL 769890, at *4. A black Nissan Altima was pulled up beside the SUV such that the SUV was blocked in. The victim ran from the SUV; co-defendant Wilson got into the SUV's driver's seat; and the Altima pulled away, followed by co-defendant Wilson. Id. Although Ms. Waters did not see the Altima's driver, she had seen the Petitioner driving the car two days previously. Id. Ms. Waters parked her car and walked to the victim; Mr. Rooks was present and asked the victim if he knew who had "done this." Id.

Antonio Anthony testified that on the day of the shooting, he saw the Petitioner, whom he had known for a "long time," driving a black Nissan Altima down the street. Crockett, 2016 WL 769890, at *4. After making a u-turn, co-defendant Wilson exited the back passenger's side of the car. The Petitioner pulled up next to the victim's SUV such that the victim could not drive away; co-defendant Wilson walked up to the SUV, hit one of the windows with a gun, and ordered the victim to open the car door; and the victim "tried to pull off." Mr. Anthony heard a gunshot, then the victim jumped out of the car and ran across the street; co-defendant Wilson got into the SUV's driver's seat; and the Petitioner and co-defendant Wilson fled the area.

Laquinta Kirk, the Petitioner's girlfriend at the time of the shooting, testified that the Petitioner's nickname was Bull. Crockett, 2016 WL 769890, at *4. After the shooting, the Petitioner picked up Ms. Kirk in his black Nissan Altima. Id. The Petitioner began wiping down the interior of the car, including the front seats and center console. Id. The Petitioner and Ms. Kirk drove to a parking lot in East Nashville to meet with detectives and "clear [the Petitioner's] name." Id.

Metro Nashville Police Officer Jeremy Smith testified that the victim's SUV, which was found in an alley, had a shattered back right passenger window, and the vehicle's contents had been "rummaged through." Crockett, 2016 WL 769890, at *5. On cross-examination, Officer Smith stated that Mr. Rooks never relayed to him the victim's statement that Bull had blocked him in. Id.

Metro Nashville Police Officer Kenneth Wolfe, the crime scene technician who examined the crime scene and the victim's SUV, noted a "defect" in the front passenger seat headrest. Crockett, 2016 WL 769890, at *5. He further noted that the vehicle had been "ransacked." Id. Dr. Erin Carney, an expert in forensic pathology, testified that the victim's cause of death was a gunshot wound to the torso and that the manner of death was homicide. Id.

Metro Nashville Detective Johnny Crumby testified that the Petitioner's mother called him and stated "that she and the [Petitioner] had been threatened" because of his alleged involvement in the victim's murder. Crockett, 2016 WL 769890, at *5. Detective Crumby went to the Petitioner's mother's house, which was "about one minute on foot" from the alley in which the victim's SUV was found. Id. The Petitioner's mother confirmed that the Petitioner's nickname was Bull. Id. Detective Crumby met with the Petitioner in a parking lot, where the Petitioner gave a recorded statement acknowledging that he was in his car at the scene and drove away afterward. Id. However, the Petitioner denied having been involved in the shooting or theft. Id. The Petitioner stated that the victim's car had collided with his Nissan Altima and that the victim got out of the SUV and ran away. Id. The Petitioner showed Detective Crumby the damage to his car caused by the collision. Id. The Petitioner stated that he drove away because he was scared and that he did not see the shooter. Id. The Petitioner further stated that he was not trying to block in the victim and denied that anyone got out of his car and shot the victim. Id. Although the Petitioner claimed that he was parked in the street and calling a girl at the time of the shooting, Detective Crumby reviewed the Petitioner's phone records and found no such call. Id.

Based upon this evidence, the jury found the Petitioner guilty of first-degree felony murder and not guilty of first-degree premeditated murder. The jury acquitted co-defendant Wilson of all charges.

*C. Direct Appeal*

In his direct appeal, the Petitioner raised the following issues: (1) whether the trial court erred in denying the Petitioner's second motion to sever relative to the Petitioner's right to a speedy trial and a fair determination of his guilt;[3] (2) the sufficiency of the evidence; (3) whether the trial court erred by admitting the victim's dying declaration to Mr. Rooks that "Bull blocked me in" because it was not proven that the victim was aware of his impending death; and (4) whether the trial court erred by imposing consecutive sentences. Crockett, 2016 WL 769890, at *7.

Relative to severance under a speedy trial analysis, this court concluded that although there was a delay of twenty-nine months between the Petitioner's arrest and the trial and the delay was in part due to the State's negligence in failing to order DNA

---

[3] The Petitioner raised as a ground for severance the State's decision during trial to admit only the portion of the victim's dying declaration implicating the Petitioner. See Tenn. R. Crim. P. 14(c)(2)(B) (A trial court may grant a severance of defendants during trial if "with consent of the defendants . . . the court finds a severance necessary to achieve a fair determination of the guilt or innocence of one or more defendants.").

-6-

testing, the Petitioner did not assert his right to a speedy trial for twenty-three months and did not suffer prejudice as a result of the delay. Crockett, 2016 WL 769890, at *7-9. This court noted that the Petitioner was serving a sentence from a previous case during the pendency of this trial and that his ability to present a defense was not impaired. Id.

Relative to severance during the trial, after a jury-out hearing, the trial court found that a portion of the victim's dying declaration regarding "the same guy" who robbed the victim previously violated Tennessee Rule of Evidence 404(b). Crockett, 2016 WL 769890, at *10. Mr. Rooks subsequently testified that "the only thing" the victim said to him was "Bull blocked [him] in." Id. The Petitioner did not object or renew his motion to sever. Id. This court concluded that because the Petitioner did not renew his severance motion or make a new motion to sever during the trial, he had waived consideration of this claim. Crockett, 2016 WL 769890, at *11. However, this court examined the issue for plain error and concluded that a clear and unequivocal rule of law had not been breached. Id. In particular, it was not clear that the victim's excluded statement referred to co-defendant Wilson, that co-defendant Wilson would have consented to a severance, or that the statement was necessary to a fair determination of the Petitioner's guilt or innocence. Id. This court noted that "the fact that the victim had also implicated co-defendant Wilson . . . would have bolstered and further corroborated the testimony of Mr. Anthony, who identified both [defendants]." Id. Moreover, this court further noted that the possible references to co-defendant Wilson would not have changed the victim's identifying the Petitioner by name in the dying declaration.

Relative to the sufficiency of the evidence, this court concluded that the evidence was sufficient to support the felony murder conviction under a theory of criminal responsibility, noting that the Petitioner drove the gunman to the scene and blocked in the victim's SUV so that he could not escape; the victim's SUV was found near the Petitioner's mother's house; the victim told Mr. Rooks that the Petitioner was involved; the Petitioner wiped down his car before he met with detectives; and the Petitioner's claim that he was merely parked on the street and making a phone call was not corroborated by his telephone records. Crockett, 2016 WL 769890, at *12-13.

Relative to the victim's dying declaration, this court concluded that the statement was properly admitted and that the circumstances indicated that the victim was aware of his impending death, although he did not explicitly state as much. Crockett, 2016 WL 769890, at *13-14. Relative to sentencing, this court concluded that the trial court did not abuse its discretion in ordering consecutive sentencing on the grounds of the Petitioner's being a dangerous offender and having an extensive criminal history. Crockett, 2016 WL 769890, at *16-18.

*D. Post-Conviction Petition*

The Petitioner filed a November 17, 2016 petition for post-conviction relief alleging the ineffective assistance of counsel. Thereafter, the post-conviction court appointed counsel on December 9, 2016, and the Petitioner filed an amended petition for post-conviction relief on January 18, 2018. Because the post-conviction hearing testimony was limited in scope and did not address all the issues raised in the petition, we will recount the details of the petition here. The Petitioner made the following allegations related to ineffective assistance of counsel:

1. Trial counsel failed to impeach Mr. Rooks's testimony regarding the victim's statement that "Bull" blocked him in. Mr. Rooks made inconsistent statements in interviews with investigators John Terry and Johnny Lawrence, who could have been called as witnesses at trial. At the motion for a new trial hearing, counsel introduced an affidavit from Mr. Lawrence, a transcript of Mr. Lawrence's interview with the Petitioner, and a copy of Mr. Terry's interview report as exhibits.

2. Trial counsel failed to "assert the proper basis" for severance pretrial and failed to renew the severance motion during trial;

3. Trial counsel failed to request a jury instruction regarding "natural and probable causes";

4. During closing, the State articulated alternative theories for theft, the underlying felony for felony murder. Specifically, the State suggested that the target of the theft was either the victim's SUV, items inside the SUV, or cash that the victim was known to carry. The Petitioner argued that the multiple theories led to a lack of jury unanimity and that trial counsel's failure to object deprived him of a fair trial through a unanimous verdict;

5. Trial counsel failed to object to inflammatory comments during the State's rebuttal argument that appealed to the jury's emotions. During co-defendant Wilson's closing argument, his attorney stated the following:

Then we get to the State's witnesses. And . . . this part of the case actually scares me. I'll explain to you at the end of my argument why it is scary.

. . . .

That scares me. And it should scare you . . . . [T]here could be an event that happened that someone apparently a year, year and a half later could say you did it . . . . And then you end up in a situation like this . . . . Could

-8-

I really believe witnesses that change their stories? It could happen to any one of us in this situation, and that should scare you . . . . But trust me, if it could happen to him, it could happen to any one of us. And your name will be on a PowerPoint presentation by the State.

The State's rebuttal argument contained the following:

So it scares [co-defendant Wilson's counsel] that this amount of evidence could be used to charge his client by, quote, the government. But what scares me is that there's two people in our community who would go in broad daylight on a day when a family is getting together to go swim, blocks somebody in, and shoots them and takes their car and thinks that their defenses are going to convince you in a courtroom today that they're not guilty. I guess we're all scared of different things, but that's what scares me, that there's two people who would, A, do that and then, B, think they got away with it.

6. Trial counsel failed to develop or present evidence regarding the disproportionality of the Petitioner's mandatory life sentence.

The Petitioner also argued that his mandatory life sentence was unconstitutional because the shooter was never convicted and that the cumulative effect of the alleged errors prejudiced him.

*E. Post-Conviction Hearing*

At the post-conviction hearing, trial counsel testified that Mr. Rooks "was the key to the [S]tate's case . . . . There actually was no other way . . . to explain the verdict." Counsel recalled Mr. Rooks's testimony that he was the first person to reach the victim after the shooting, that the victim said Bull had blocked him in, and that the Petitioner was known as Bull. When asked whether Mr. Rooks stated that the victim repeated the phrase three times, counsel responded that he had not reviewed the trial transcript and that he knew Mr. Rooks "made that statement at some point." Counsel opined that Mr. Rooks's testimony affected the jury. Counsel stated that in the motion for a new trial, he attached "two affidavits from our investigators, and they showed some variance on some points from the statements that [Mr. Rooks] had made originally to the police." Counsel did not recall the specific differences between the statements and Mr. Rooks's testimony. Counsel acknowledged that he did not call either investigator as a witness at trial and that the jury did not hear impeaching testimony relative to Mr. Rooks. When asked to clarify counsel's statement at the motion for a new trial hearing that he "could have been infinitely more effective" in cross-examining Mr. Rooks, counsel stated that Mr. Rooks

-9-

was "an absolutely critical witness" and that without the jury's accrediting his testimony, there was insufficient evidence to convict the Petitioner.

Trial counsel testified that he filed two motions to sever the co-defendants in the Petitioner's case. The first motion "was resolved by the State's concession that they had no intention of introducing the conflicting statements pretrial[.]" The second motion "addressed what was a good deal of hostility between the two defendants. They were taking inconsistent and differing postures. They did not like each other."[4] Counsel noted that the Petitioner had a speedy trial issue because he had been in custody since 2012 and "this [was] actually the third indictment for [the Petitioner]." Counsel agreed that the trial court stated that if grounds for a severance arose during the trial, he could "revisit the issue[.]" Counsel acknowledged that he did not renew the motion to sever during the trial, although he maintained a severance was necessary in the pretrial motion, at the motion for a new trial, and on direct appeal.[5]

Trial counsel testified that in the motion for a new trial, he filed a memorandum of law regarding the "Natural and Probable Consequences Rule[.]" Counsel explained that it was "a gloss on the common rule of aiding and abetting[.]" Counsel stated that the jury was not instructed on this rule and that he did not recall having "explicitly" requested the instruction. Counsel noted that he had written in his docket notes that there was a "variance between the court's charge and the pattern [jury] instruction."

When asked whether it was possible that the jurors returned a guilty verdict based upon "several different" theories articulated in the State's closing, trial counsel stated, "In my opinion, yes. It's possible." Counsel agreed that it was disproportionate for the Petitioner to be convicted of felony murder when "there was no shooter [who] was convicted of any underlying crime." Counsel noted that he had never "had that situation occur before."

On cross-examination, trial counsel testified that he had been licensed to practice law since 1976, that he had worked for the Nashville Public Defender's Office for twenty-six years, and that by the time of the Petitioner's trial, he had lost track of how

---

[4] The motion to sever reflected that due to the co-defendants' being aware of incriminating statements each had made about the other, the co-defendants had to be separated in jail and special security was anticipated to be needed at the trial. Trial counsel argued that this animosity would be evident to the jury.

[5] The record reflects that although the speedy trial issue was raised in the motion for a new trial and on direct appeal, trial counsel did not raise his second pretrial severance issue related to the animosity between the co-defendants. Counsel's second severance issue in the motion for a new trial and on direct appeal related to the redaction of Mr. Rooks's testimony regarding the victim's dying declaration, which occurred during the trial.

many jury trials he had performed. Counsel noted that another assistant public defender had originally been assigned to the Petitioner's case and "left the case during the second indictment[.]" Counsel was eventually assigned to the case along with another assistant public defender, and he estimated that he began work on the case before October 2013. Counsel agreed that after a hearing, the trial court issued a written order denying the second motion to sever. Counsel stated that he and co-counsel visited the Petitioner "[l]ots of times" and discussed the charges and possible defenses.

Trial counsel testified that because of the "unusual circumstances" of the case, he retained a second investigator in addition to Mr. Terry and that the two investigators interviewed witnesses. Counsel recalled Mr. Anthony's testimony that the Petitioner's car had blocked in the victim and that the victim told Mr. Anthony "that it was Bull."[6] Counsel also recalled Mr. Anthony's stating that he saw the shooter get out of the Petitioner's car and that Mr. Anthony was familiar with the Petitioner. Counsel stated that other witnesses at trial identified the Petitioner's car, and he noted that "it was an unusual car, it was one that was known in the neighborhood." Counsel continued, "I don't know that anyone else testified before the jury that the car was blocking [the victim] in." Counsel referred to his trial notes and stated that Ms. Keeler testified regarding a black car parked next to the victim's truck "right to the rear, right to the door where you would get out of the truck." Counsel acknowledged that the Petitioner's recorded police interview was played for the jury and that during the interview, the Petitioner admitted to having been present at the crime scene.

Post-conviction counsel stated that the majority of the Petitioner's claims were "of record" and entered the trial transcript as an exhibit to the hearing. No other witnesses were called.

The post-conviction court thereafter denied the petition by written order filed on July 5, 2018. The court noted trial counsel's statement at the motion for a new trial that he "could have been infinitely more effective" in his cross-examination of Mr. Rooks. The court found that as "part of the motion for new trial, trial counsel alleged the defense was hampered in the cross-examination of [Mr.] Rooks due to the limitations the [c]ourt placed on his testimony" and that this issue was litigated on direct appeal. The court

---

[6] Mr. Anthony testified at trial that he saw the Petitioner driving an Altima, that the Petitioner blocked in the victim, that Mr. Anthony was the first person to reach the victim, and that Mr. Rooks arrived about ten minutes later. Mr. Anthony also testified that he saw a second man, whom he identified as co-defendant Wilson, exit the car with a gun. On cross-examination, Mr. Anthony acknowledged his previous statements to police that he did not see the driver's or shooter's faces and that three people were in the Petitioner's car. He also noted that he did not know co-defendant Wilson's name at the time of the shooting. When asked how he learned co-defendant Wilson's name, Mr. Anthony stated, "The projects talk." The trial transcript does not reflect that Mr. Anthony testified regarding any dying declarations by the victim.

accredited trial counsel's testimony and found that "while Mr. Rooks may have varied in the statements he made, nothing in the record establishe[d] these variances were material." In a footnote, the court stated that upon review of the transcript of Mr. Lawrence's interview with Mr. Rooks, the record reflected that Mr. Rooks's interview was consistent with his trial testimony regarding the victim's dying declaration. The court noted that neither Mr. Lawrence nor Mr. Terry were called as witnesses at the post-conviction hearing to establish their trial testimony or be cross-examined by the State. The court further noted that the testimony of Ms. Keeler, Ms. Patterson, Mrs. Keeler, Ms. Waters, and Mr. Anthony corroborated the victim's statement that the Petitioner had blocked in his car, and Ms. Kirk testified that the Petitioner wiped down the interior of his car shortly after the shooting. The court found that the Petitioner had not established prejudice.

Relative to severance, the post-conviction court found that the Petitioner did not allege the grounds on which trial counsel should have renewed the severance motion in order to demonstrate that the motion would have been successful. The court noted that this court considered the pretrial severance issue on direct appeal for plain error and concluded that no violation of a clear and unequivocal rule of law occurred. The court found that the Petitioner had not proven prejudice.

Relative to the jury instruction on natural and probable consequences, the post-conviction court found that trial counsel raised the issue in the motion for new trial. The court further found that "[b]ecause the Petitioner was statutorily responsible for the homicide regardless of its foreseeability, the [c]ourt was not required to provide the jury with a natural and probable consequences instruction."

Relative to the State's articulating multiple theories of theft in closing, the post-conviction court found that the jury was instructed by the trial court that the underlying felony was theft, that the trial testimony established a theft of the victim's SUV occurred, and that the jury verdict form also specified that the underlying felony was theft. The post-conviction court found that the Petitioner had not established prejudice and that the evidence established the underlying theft as the basis for felony murder. Relative to the State's rebuttal closing, the court found that, viewing the statement in context, the "excerpt identified as objectionable by the Petitioner does not amount to prosecutorial misconduct warranting a new trial, particularly in light of the evidence against the Petitioner."

Relative to the proportionality of the Petitioner's sentence, the post-conviction court found that the life sentence was mandated by statute and that consecutive sentencing had been affirmed by this court. This timely appeal followed.

<u>ANALYSIS</u>

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The Petitioner raises two constitutional claims, ineffective assistance of counsel and disproportionate sentencing. Relative to ineffective assistance, the Petitioner challenges trial counsel's cross-examination of Mr. Rooks, his failure to argue successful grounds for a severance during trial, his failure to request a jury instruction, and his failure to object to the State's closing and rebuttal arguments. The Petitioner also raises ineffective assistance as it relates to counsel's failure to present evidence of disproportionality of his life sentence, which we will consider during our proportionality analysis.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); <u>see</u> <u>Dellinger v. State</u>, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. <u>Fields v. State</u>, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. <u>Id.</u>

*A. Ineffective Assistance of Counsel*

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. <u>Dellinger</u>, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>see</u> <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." <u>Goad v. State</u>, 938 S.W.2d 363, 370 (Tenn. 1996). The <u>Strickland</u> standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. <u>State v. Melson</u>, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. <u>Fields</u>, 40 S.W.3d at 457.

-13-

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id. We apply the Strickland test to claims of ineffective assistance of trial counsel as well as ineffective assistance of appellate counsel. Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004).

1. Cross-examination of Mr. Rooks

The Petitioner contends that trial counsel provided ineffective assistance in his examination of Mr. Rooks, arguing that Mr. Lawrence and Mr. Terry should have been called as impeachment witnesses. The State responds that the Petitioner has not proven prejudice given that multiple witnesses tied the Petitioner to the murder.

We note that although the Petitioner states that Mr. Rooks "gave contradicting information than what he testified to[,]" the Petitioner does not give examples of the contradictory information, and trial counsel did not recall the substance of the variations in Mr. Rooks's testimony versus his interviews with defense investigators. The Petitioner in his appellate brief emphasized that Mr. Rooks testified that the victim "told him three times, 'Bull blocked me in,' and upon cross-examination, denied ever telling the police

-14-

that the victim never actually uttered any words because he had immediately lost consciousness."

As the State and the post-conviction court observed, Mr. Lawrence and Mr. Terry were not called as witnesses at the post-conviction hearing. Generally, if a post-conviction petitioner argues that a witness should have been called at trial, the proposed witness must testify at the post-conviction hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. Apr. 11, 1990) ("It is elementary that neither a trial judge nor an appellate court can speculate or guess . . . what a witness's testimony might have been if introduced by defense counsel."). The Petitioner has not proven that counsel was deficient for failing to call these witnesses.

We have, however, reviewed the exhibits to the motion for a new trial hearing. These exhibits arguably contain the substance of what Mr. Terry and Mr. Lawrence would have testified to at trial and reflect that Mr. Rooks told Mr. Terry that "the detective's summary did not include all of the information he had provided regarding statements made by [the victim]" and that the victim told Mr. Rooks that "Bull . . . blocked [him] in[.]" Mr. Rooks told Mr. Lawrence multiple times during his interview that the victim had said Bull blocked him in. Mr. Rooks reiterated several times during the interview that the victim identified "Bull" as the person who blocked in his car.[7] Mr. Rooks further stated that the victim would have been able to speak to Ms. Keeler before Mr. Rooks reached the victim. Mr. Rooks did not see Mr. Anthony, but he noted that once he saw the victim, "everybody else was irrelevant . . . . I didn't even pay attention to who was around." The main differences between Mr. Rooks's trial testimony and his interviews with defense investigators involved where Mr. Rooks was when he initially heard the victim had been shot and whether Mr. Rooks was the first person to speak to the victim.[8]

We note that trial counsel's statement at the motion for a new trial hearing regarding being "infinitely more effective" on cross-examination occurred in the context

---

[7] Mr. Rooks also stated in both interviews that the victim identified the shooter as the "same guy" who had tried to rob him on a previous occasion, which was excluded by the trial court as prior bad acts evidence relative to co-defendant Wilson. See Tenn. R. Evid. 404(b). Mr. Rooks gave more details about the shooter, whom he identified as "Ray," in his interview with Mr. Lawrence. At the motion for a new trial hearing, trial counsel argued that his cross-examination of Mr. Rooks was impeded by the limited examination available to him as he attempted not to elicit this portion of the statement.

[8] In the interview with Mr. Lawrence, Mr. Rooks stated that he was playing basketball when an acquaintance ran up to him and told him the victim had been shot. At trial, Mr. Rooks testified that he was walking through an alley when this occurred. Likewise, although Mr. Rooks maintained at trial that he was the first person to speak to the victim, in his interview with Mr. Lawrence, he indicated Ms. Keeler had time to speak to the victim before Mr. Rooks arrived.

-15-

of argument regarding the defense's need to avoid eliciting the portions of Mr. Rooks's statement that had already been excluded by the trial court. This statement did not relate to calling the investigators as witnesses.

We agree with the post-conviction court and the State that the Petitioner has not proven prejudice in regard to trial counsel's examination of Mr. Rooks. The Petitioner's involvement in the murder was not established by Mr. Rooks alone. Mr. Anthony identified the Petitioner as the driver of the Altima, and multiple witnesses stated that they knew the Altima belonged to the Petitioner. Trial counsel noted at the post-conviction hearing that the Petitioner's car was distinctive and known in the neighborhood. In addition, Ms. Kirk testified that the Petitioner wiped down the inside of the car before speaking to police. Although variations existed between the defense interviews and Mr. Rooks's trial testimony, they were not material. The Petitioner is not entitled to relief on this basis.

2. Severance

The Petitioner contends that trial counsel was ineffective for failing to assert the "proper basis" for a severance pretrial and for failing to renew the motion at trial. The State responds that the Petitioner has not proven prejudice because this issue was considered on direct appeal and found to be without merit.

For clarity, we note that the Petitioner's two pretrial severance claims were not the same claims he asserted in his motion for a new trial, on direct appeal, and in his post-conviction proceedings. The Petitioner's pretrial speedy trial claim was renewed in the motion for a new trial and on direct appeal, where this court found it to be without merit. The speedy trial severance issue has not been raised relative to ineffective assistance. Likewise, the second pretrial severance motion related to the acrimony between the co-defendants was not raised in the motion for a new trial, on direct appeal, or as part of the post-conviction petition.

The Petitioner's third severance issue, which was raised in his motion for a new trial and on direct appeal, is the focus of his ineffective assistance claim. In the motion for a new trial, the Petitioner argued that a severance should have been granted based upon the exclusion of Mr. Rooks's testimony relating the portion of the victim's dying declaration identifying the shooter as the "same guy."

Although the issue was waived on direct appeal because trial counsel failed to make a contemporaneous motion to sever on the ground that arose during trial, this court considered the issue for plain error and concluded that a clear and unequivocal rule of law had not been breached. The Petitioner had not shown that co-defendant Wilson

would have consented to a severance and because the excluded portion of the victim's statement did not explicitly refer to co-defendant Wilson, it would not have helped the Petitioner's defense. To the contrary, this court noted that the remainder of the victim's statement would not have changed that the victim specifically identified the Petitioner to Mr. Rooks; in fact, the unredacted statement could have corroborated Mr. Anthony's testimony that he saw co-defendant Wilson exiting the Petitioner's car just before the shooting.

Relative to deficiency, we agree that the Petitioner did not inquire, and trial counsel did not indicate at the post-conviction hearing, whether the decision not to renew the severance motion during trial was a tactical one. In the absence of testimony to this effect, we will assume that counsel made a calculated decision. See Gary Hawkins v. State, No. W2016-00723-CCA-R3-PC, 2017 WL 2829755, at *7 (Tenn. Crim. App. June 30, 2017) (We agree with the post-conviction court's conclusion that "without testimony from trial counsel as to 'why' he chose not to object to a statement, the court must assume it was a valid tactical decision."); see also State v. Leroy Sexton, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan. 12, 2007) (concluding that because "no testimony or other evidence [was] elicited from trial counsel indicating whether the questions were part of his trial strategy," this court could not "speculate as to trial counsel's intentions and therefore we cannot determine that his performance was deficient"). The Petitioner has not proven that counsel was deficient.

Nevertheless, the Petitioner has not proven prejudice from the joint trial because the Petitioner has not argued grounds upon which a severance would have been granted. Although the Petitioner states that he could have more thoroughly cross-examined Mr. Rooks had the 404(b) evidence relative to co-defendant Wilson not been excluded, the variances in Mr. Rooks's testimony did not change his consistent recollection of the victim's identifying the Petitioner as having blocked him in.

The Petitioner contends, without citation to authority, that because co-defendant Wilson was not convicted of the victim's murder, prejudice has been established because it is "inherently and fundamentally unfair" that the Petitioner was found to be criminally responsible for a murder for which no one was convicted. The Petitioner avers that a separate trial would have resulted in his acquittal.

The Petitioner's argument is without merit in this regard, as evidenced by this court's analysis of the severance issue and the sufficiency of the evidence on direct appeal. No matter the identity of the shooter, a reasonable trier of fact could have found that the Petitioner was a participant in the theft of the victim's SUV and that as a result, the Petitioner was criminally responsible for the victim's death.

-17-

We note that co-defendant Wilson's defense theory at trial was one of mistaken identity. In contrast, the Petitioner did not dispute that he was present at the crime scene; he only sought to introduce doubt as to his participation in the crime. We further note that the Petitioner was acquitted of premeditated first-degree murder and that this court concluded on direct appeal that the evidence was sufficient to support the felony murder conviction. Multiple witnesses and the victim identified the Petitioner as having driven the car that blocked in the victim's SUV; Mr. Anthony saw the shooter exit the Petitioner's car; the victim's SUV was found near the Petitioner's mother's house; and the Petitioner wiped down the interior of his car before speaking to police. The Petitioner has not established that the joint trial prejudiced him, and he is not entitled to relief on this basis.

3. Jury Instruction

The Petitioner contends that trial counsel rendered ineffective assistance because he did not request a jury instruction on "the natural and probable consequences rule." The State responds that the trial court was not required to issue this instruction for a felony murder charge.

The natural and probable consequences rule is a common-law concept that has been incorporated into modern criminal responsibility jurisprudence. In State v. Howard, 30 S.W.3d 271, 276 (Tenn. 2000), a first-degree premeditated murder case, our supreme court held that

> to impose criminal liability based on the natural and probable causes rule, the State must prove beyond a reasonable doubt and the jury must find the following: (1) the elements of the crime . . . that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated [section] 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime.

Id. "The rule . . . is based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably and foreseeably put into motion." Id. (citing State v. Carson, 950 S.W.2d 951, 954-55 (Tenn. 1997)). The record reflects that although an instruction on criminal responsibility was given in this case, one was not issued on the natural and probable causes rule. Trial counsel did not request the instruction or raise the issue until the motion for a new trial. The issue was not raised on direct appeal.

This court has concluded that a natural and probable consequences instruction is not required in felony murder cases because the felony murder statute imposes liability

-18-

for deaths occurring during the commission or attempted commission of enumerated felonies, regardless of the foreseeability of such deaths. State v. Winters, 137 S.W.3d 641, 659 (Tenn. Crim. App. 2003). However, the Petitioner was also charged with first-degree premeditated murder under a theory of criminal responsibility. Pursuant to Howard, the jury should have been instructed on the natural and probable causes rule relative to the premeditated first-degree murder charge. Trial counsel rendered deficient performance by not requesting this required jury instruction. However, the Petitioner was acquitted of first-degree premeditated murder and, therefore, suffered no prejudice. The Petitioner is not entitled to relief on this basis.

4. Closing Arguments/Unanimity

The Petitioner contends that trial counsel erred by failing to object during the State's closing argument. The Petitioner argues that the State "was never able to clarify what [the] felony [underlying felony murder] was" during its closing argument and that as a result, the verdict was not unanimous. The Petitioner quotes the prosecutor as stating that the theft could have been the victim's car, items inside the victim's car, or items from the victim's person. The State responds that the predicate felony for felony murder may be based upon alternate theories.

The indictment for Count 1, felony murder, charged theft as the underlying felony. The indictment did not specify the target of the theft. The Petitioner's argument is not that different felonies were alleged during closing, but rather that jury unanimity was violated by the State's articulating different potential targets of the theft.

Our supreme court has held that the State is not required to make an election of facts to support the elements of an offense. State v. Adams, 24 S.W.3d 289, 297 (Tenn. 2000) (holding that State's failure to elect which injury resulted from child neglect did not create issue of jury unanimity); see State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999) (holding that no issue of jury unanimity existed where the jury determined guilt based upon one criminal incident, a car accident, under alternate theories of direct and criminal responsibility, because criminal responsibility was not a separate offense). Similarly, this court has concluded that jury unanimity is not violated where "alternative theories, mental states, modes of committing the crime, or means by which the crime was committed" were submitted to the jury. State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *5 n.4 (Tenn. Crim. App. May 22, 1998) (citing Tenn. Code Ann. § 40-18-112 (stating that a jury may convict even when different intents, modes, or means of committing an offense are charged, so long as the jury is satisfied that the act was committed with one of the charged intents, modes, or means)).

Trial counsel was not deficient for failing to object to the State's presenting alternative factual theories for finding that a theft or attempted theft occurred in the context of the felony murder charge. The jury was not required to be unanimous on the factual target of the theft or attempted theft, only that it occurred. We note that the evidence at trial firmly established that the victim's SUV was taken after he was shot. In light of this evidence, the Petitioner has not proven prejudice resulted from the lack of such an objection. The Petitioner is not entitled to relief on this basis.

5. Closing Arguments/Inflammatory Comments

The Petitioner argues that trial counsel was ineffective for failing to object to the prosecutor's statement in rebuttal argument that she was "scared" by the circumstances of the offense. The State responds that that the cited portions of rebuttal argument were not objectionable and that the Petitioner has not proven the decision was not tactical.

We note that the prosecutor's comments regarding being "scared" were given in rebuttal to statements made by co-defendant Wilson's counsel in closing. Co-defendant Wilson's counsel argued that he was scared by the insufficiency of the State's evidence as to identity. He commented at some length that being wrongfully prosecuted for a crime "could happen to any one of us," even going so far as to tell the jurors that based upon inconsistent witness statements, "your name will be on a PowerPoint presentation by the State." Co-defendant Wilson's counsel used as a theme that it "scared" him and should scare the jury that the government could prosecute on such little evidence. The prosecutor was within her rights to respond to this argument with her own. She did not make any unduly inflammatory appeals to the jury's emotions in doing so, and the references to being "scared" occurred twice and were brief.

We further note that the Petitioner did not question trial counsel regarding whether the decision not to object was tactical, and in the absence of such testimony, we must presume that counsel made a calculated decision. See Hawkins, 2017 WL 2829755, at *7. This court has previously considered "whether the failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel." Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan. 15, 2010). "The decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." Id. Trial counsel could decide not to object for several valid tactical reasons, including not wanting to emphasize unfavorable evidence. Id. (quoting Gregory Paul Lance v. State,

No. M2005-01675-CCA-R3-PC, 2006 WL 2380619, at *6 (Tenn. Crim. App. Aug. 16, 2006)).  The Petitioner has not proven that counsel was deficient.

Moreover, the Petitioner has not proven prejudice because he failed to offer evidence that such an objection would have succeeded, especially in light of his co-defendant's statements in closing.  The evidence does not preponderate against the post-conviction court's finding that no prosecutorial misconduct occurred during the State's rebuttal closing.  The Petitioner is not entitled to relief on this basis.

B.  *Proportionality of Sentence*

The Petitioner contends that the life sentence mandated by Tennessee Code Annotated section 39-13-202(c)(3) is disproportionate in light of the "undisputed" fact that the Petitioner "did not kill anyone."  The Petitioner also argues, in a related issue, that trial counsel was ineffective for failing to develop and present evidence regarding disproportionality at the sentencing hearing.  The State responds that the Petitioner did not present evidence of disproportionality at the post-conviction hearing and that the sentence was not disproportionate.

The only authority the Petitioner cites in support of his proportionality argument is Screws v. U.S., 325 U.S. 91, 123 (1945), a Supreme Court case upholding the constitutionality of a federal statute criminalizing a state actor's violating a citizen's Fourteenth Amendment rights, in which the Eighth Amendment is not discussed.  The Petitioner then states, "The punishment of a life sentence fails to promote any compelling state interest that would justify violating" the Petitioner's Eighth Amendment rights.

The Eighth Amendment of the United States Constitution prohibits cruel and unusual punishment; relevant to this case, this includes punishments disproportionate to the crime committed.  U.S. Const. amend. VIII.  Although cases examining proportionality of a sentence are often capital cases, the United States Supreme Court has noted that a "narrow proportionality principle" also applies to noncapital cases.  Ewing v. California, 538 U.S. 11, 20 (quoting Harmelin v. Michigan, 501 U.S. 957, 996-97 (Kennedy, J., concurring in part and concurring in judgment)).  In State v. Harris, 844 S.W.2d 601, 602-603, our supreme court also held that a proportionality analysis is mandated in noncapital cases by article I, section 16 of the Tennessee Constitution.  However, both the United States and Tennessee Supreme Court have noted that "outside the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare."  Ewing, 538 U.S. 11 at 21 (quoting

Rummel v. Estelle, 445 U.S. 263, 272 (1980)); Harris, 844 S.W.2d at 602 (quoting Rummel, 445 U.S. at 272).

In noncapital cases, we consider first whether an inference of gross proportionality arises by comparing the gravity of the offense and the harshness of the penalty. State v. Smith, 48 S.W.3d 159, 171 (Tenn. Crim. App. 2000) (citing Solem v. Helm, 463 U.S. 277, 290-91 (1983)).

> Factors relevant to the gravity of the offense include (1) the nature of the crime, including whether society views the crime as serious . . . and whether the crime is violent . . . ; (2) the circumstances of the crime, including the culpability of the offender, as reflected by his intent and motive, and the magnitude of the crime; and (3) the existence and nature of any prior felonies if used to enhance the defendant's penalty[.]

> Factors relevant to the harshness of a penalty include the type of penalty imposed and . . . the length of a term [of confinement] and the availability of parole or other forms of early release.

Id. (internal citations omitted). This court has noted that "[t]he mandatory nature of a penalty will not alone raise an inference of gross disproportionality or render the penalty unconstitutional." Id.

The nature of the crime in this case, felony murder, was both serious and violent. The Petitioner pulled his car up to the victim's SUV such that the victim could not leave; a second person, whom Mr. Anthony saw exit the Petitioner's car, hit the victim's window with a gun and demanded that he exit the car; when the victim resisted, the second person shot the victim as he struggled to escape; and the second person and the Petitioner drove off with both vehicles. Although the Petitioner did not pull the trigger, he was culpable in a crime of a high magnitude, the death of an innocent person. No prior felonies were used to enhance the term of his sentence, although his criminal history was used to impose consecutive sentencing with the sentence in a previous case.[9] The Petitioner's prior felonies included dangerous and violent offenses—evading arrest with a high risk of death, aggravated assault, and aggravated burglary. The trial court also considered testimony at the sentencing hearing that while in jail, the Petitioner had assaulted another inmate so severely that the inmate's jaw had to be wired shut. We note that the death penalty and life without the possibility of parole were available sentences, that the State did not pursue these high sentences, and that the Petitioner's sentence of life, which carries the possibility of parole, was the statutory minimum.

---

[9] The Petitioner had "six or seven prior felony convictions" according to the trial court at sentencing.

The Petitioner's specific complaint is that because no principal actor was convicted of the underlying murder, his life sentence for felony murder under a theory of criminal responsibility is disproportionate. The Petitioner has cited no authority, and there is none, for the proposition that accomplices are only punished for felony murder if the principal is also convicted.

Tennessee Code Annotated section 39-13-202(a)(2) explicitly makes those who participate in the enumerated felonies liable for deaths that occur during the commission of those felonies, regardless of the foreseeability of those deaths. When convicted of felony murder by a theory of direct or criminal responsibility, the minimum sentence is life. We do not think that the legislature, which drafted the felony murder statute in terms of strict liability, meant to exclude accomplices from its scope where the principal could not be identified by the State.

As noted in the direct appeal and in our discussion above, the evidence was sufficient for the jury to find that the Petitioner participated in the theft of the victim's car and that by doing so, he became criminally responsible for the victim's death. It is irrelevant to an analysis of the proportionality of the Petitioner's punishment that his co-defendant was acquitted. A life sentence for the victim's death is not disproportionate. The Petitioner is not entitled to relief on this basis.

Likewise, trial counsel was not deficient for failing to develop and introduce evidence of proportionality at the sentencing hearing. We note that the Petitioner's citation to Kennedy v. Louisiana, 554 U.S. 407, 419 (2008), as modified by Kennedy v. Louisiana, 554 U.S. 945 (2008), is misplaced because Kennedy was a direct appeal of a death penalty case. There is no authority to suggest that a defense attorney in a noncapital case is deficient for failing to develop and present evidence of proportionality during sentencing.

The Petitioner's sentence is governed by the proportionality standard announced in Harris, as discussed in Smith. The case-by-case consideration of the gravity of the offense and the harshness of the penalty in noncapital cases, unlike capital cases, does not require considering statistical data regarding similarly-situated defendants and their sentences.[10] Although appellate courts reviewing death sentences utilize a proportionality analysis,[11] there is no rule even in capital cases mandating consideration during the penalty phase of trial of the statistical data to which the Petitioner alludes. It stands to

---

[10] We do not imply that is would be improper for defense counsel to present or a trial court to consider such evidence, in the court's discretion.

[11] Capital proportionality review is governed by State v. Bland, 958 S.W.2d 651 (Tenn. 1997).

reason that there is certainly no such requirement in noncapital cases. We will not find counsel deficient for failing to develop this evidence.

The Petitioner has similarly not proven prejudice because he did not present the evidence at the post-conviction hearing. See Black, 794 S.W.2d at 757. The Petitioner is not entitled to relief on this basis.

*C. Cumulative Deficiency/Error*

The Petitioner contends that the cumulative effect of trial counsel's alleged deficiencies and the disproportionality of his sentence deprived him of a fair trial. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010).

We have concluded that only one instance of deficiency occurred, the failure to request a jury instruction on natural and probable causes relative to the first-degree premeditated murder charge; the Petitioner suffered no prejudice from this error because he was acquitted of first-degree premeditated murder. Having discerned no other error, cumulative error analysis does not apply. The Petitioner is not entitled to relief on this basis.

## CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE